De Graffenreid *et al.* v. Iowa Land & Trust Co.

No. 526, Okla. T.    Opinion Filed April 13, 1908.

(95 Pac. 624.)

1.  INDIANS—Lands—Creek Allotment—Title Acquired—Statutory Provisions.   A citizen of the Creek Nation, by the Commission to the Five Civilized Tribes duly enrolled as a Creek freedman, who on April 22, 1899, selected her allotment upon the public domain of said nation, and received a certificate of allotment therefor, describing the lands, is seised of an equitable estate in fee therein, the sole effect thereon of section 6 of the act of March 1, 1901, (31 Stat, 863, c. 676), being to place said allotment on an equal footing as to rights and title with allotments theretofore made under and by virtue of Act June 28, 1898, c. 517, 30 Stat. 495, and does not operate as a legislative grant of the legal title in fee.

2.  SAME—Descent—Creek Laws.   A citizen of the Creek Nation, by the Commission to the Five Civilized Tribes duly enrolled as a Creek freedman, who on April 22, 1899, selected her allotment upon the public domain of said nation, and received a certificate of allotment therefor, describing the lands, is seised of an equitable estate in fee therein, which upon her death on June 7, 1902 descended, both surplus and homestead, to her heirs, according to the laws of descent and distribution of the Creek Nation, as provided in Act March 1, 1901, sec. 7, c. 676, 31 Stat. 863, known as the "Original Agreement."

3. **SAME—Repeal of Creek Law.** The provision of the Indian appropriation act, passed by Congress on May 27, 1902 (32 Stat. 258, c. 888), repealing the provisions of the said original agreement made by the Creeks, in so far as it provided for descent and distribution according to the Creek law of descent and distribution, and substituting therefor chapter 49 of Mansfield's Digest (Ind. T. Ann. St. 1899, c. 21), did not, by virtue of the joint resolution of Congress, take effect until July 1, 1902.

4. **SAME—Issuance of Patent After Allottee's Death—Heirs.** Where a citizen of the Creek Nation, by the Commission to the Five Civilized Tribes duly enrolled as a Creek freedman, who, on April 22, 1899, selected her allotment upon the public domain of said nation, and received her certificate of allotment therefor, describing the lands, and on June 7, 1902, died, before patent issued, a patent afterwards issued to the heirs of such person, without naming them, vested in said heirs the title to the lands therein described; said heirs to be determined by judicial construction.

5. **SAME—"Nearest Relation."** Upon descent cast by such Creek freedman on June 7, 1902, intestate, without child or the issue of child or children her surviving, leaving her surviving an intermarried noncitizen father, and an intermarried noncitizen husband, a mother, three sisters, and a brother, all citizens of the Creek Nation, her mother as her "nearest relation" is entitled to inherit an undivided one-half interest in her allotment, under section 6 of the laws of descent and distribution of the Creek Nation (Act March 1, 1901, c. 676, 31 Stat. 863), and the intermarried noncitizen husband of the intestate the remaining undivided one-half interest therein, under chapter 10, sec. 8, Comp. Laws Creek Nation 1900, in force in the Creek Nation at the time of descent cast, construed with article 3, sec. 1, of said Compiled Laws.

6. **SAME—Agreements With Indian Nations—Construction.** In construing an agreement made by Congress with the Creek Nation and submitted to the citizens of the nation for their ratification by popular vote, it is manifestly unfair to construe it in any other manner than that in which it was obviously understood by them at the time, taking the terms employed in their common and ordinary acceptance; they being a simple and dependent people.

7. **STATUTES—Construction With Reference to Other Statutes.** In arriving at the intent of the Legislature in enacting a statute, not only must the whole statute and every part of it be considered, but where there are several statutes in pari materia, they are all, whether referred to or not, to be taken together and one part construed with another in the construction of any material provision. Statutes are in pari materia which relate

to the same person or thing, or to the same class of persons or things.

8.  **DESCENT AND DISTRIBUTION—"Heirs" Construed to Mean "Children."**  The word "heirs" in section 8 of the Creek law of descent and distribution, set forth in Perryman's Digest. of 1900, is construed to mean "children" in this case.

9.  **SAME—Murder of Intestate by Person Entitled to Inherit—Effect.**  In the absence of express provision excluding the husband from inheriting from his wife under the laws of descent and distribution of the Creek Nation in force at the time of descent cast, the operation of said laws is not affected by the fact that the husband murdered his wife, but not for the purpose of at once obtaining the inheritance.

(Syllabus by the Court.)

*Error from the United States Court for the Western District of the Indian Territory, at Muskogee; before Wm. R. Lawrence, Judge.*

Action by the Iowa Land & Trust Company against R. P. De· Graffenreid and others to quiet title, or for partition or sale of the premises as their respective interests might appear.  Judgement for plaintiff, and defendants sued out a writ of error to the United States Court of Appeals in the Indian Territory, whence the same came before the Supreme Court of Oklahoma by virtue of enabling act, June 16, 1906, c. 3335, 34 Stat. 267.  Reversed and remanded with instructions.

On June 7, 1902, Castella Reeves, hereinafter called Castella Brown, died intestate in the Creek Nation, Ind. T., without child or children or the issue of such surviving her.  She left surviving Cynthia Tolliver, her mother, Viola Brown Mathews, Shellie Brown, and Henrietta Stewart, her sisters, and George Brown, a brother, all duly enrolled citizens of the Creek Nation, but not of Indian blood.  She left also surviving George Brown, her father, not a citizen of the Creek Nation, and Ben Reeves, her husband, "who was at no time a citizen of said nation."  She was murdered by her said husband, Ben Reeves, who at the January term of the

United States Court in the Indian Territory at Muskogee, was tried and convicted, and sentenced to life imprisonment. Prior to her death, to wit, on April 22, 1899, Castella Brown selected her allotment, and on the same day received a certificate of allotment from the Commission to the Five Civilized Tribes No. 1,330 for the S. E. ¼ of section 9, township 18 N., range 18 E., in the Creek Nation, Ind. T. After her death, to wit, on July 26, 1905, Cynthia Tolliver, her mother, for a valuable consideration, made, executed, and delivered to the Iowa Land & Trust Company a warranty deed to said lands in fee, which was duly recorded, and said company placed in possession of said lands, which they have since retained. On·August 16, 1905, said Henrietta Stewart and her husband, J. R. Stewart, for a valuable consideration, also made, executed, and delivered to said company a warranty deed to her undivided·interest in said land, which was duly recorded. In August, 1905, George Brown, her brother, a single man, for a valuable consideration, also made, executed, and delivered to said company a warranty deed to his undivided interest in said land, which was duly recorded. On July 15, 1904, Ben Reeves, her husband, to compensate Robert P. De Graffenreid, his attorney, for his services in defending him for the murder of his wife, Castella Brown, made, executed, and delivered to said Robert P. De Graffenreid a warranty deed to his undivided one-half interest in said land, which was duly recorded. On September 23, 1904, Shellie Brown, her sister, for a valuable consideration, made, executed, and delivered to J. P. Allen, J. S. Calfee, and B. L. Hart a warranty deed to her undivided interest in said lands, which was duly recorded. On September 24, 1904, said Allen and wife, Calfee and wife, and Hart and wife, for a valuable consideration, made executed and delivered to the Creek Land & Improvement Company a quit claim deed to all their right, title, and interest in said land, which was duly recorded.

At the time of the death of Castella Brown, the Creek laws of descent and distribution were and are as follows:

"Sec. 6. Be it further enacted that if any person die without a will, having property and children, the property shall be equally divided among the children by disinterested persons and in all cases where there are no children, the nearest relation shall inherit the property."

"Sec. 8. The lawful or acknowledged wife of a deceased husband shall be entitled to one-half of the estate, if there are no heirs, and an heir's part if there should be other heirs in all cases where there is no will. The husband surviving shall inherit of a deceased wife in like manner."

"Sec. 1. All noncitizens not previously adopted, and being married to citizens of this nation, or having children entitled to citizenship, shall have the right to live in this nation and enjoy all privileges enjoyed by other citizens, except in participation in the annuities and final participation in the lands."

On January 7, 1907, the Iowa Land & Trust Company, a corporation, filed its complaint in equity in the United States Court in the Indian Territory, Western District, at Muskogee, against said Robert P. De Graffenreid, Creek Land & Improvement Company, and Viola Brown Mathews, a sister, and George Brown, the father of Castella Brown, deceased, to cancel their deeds as a cloud on plaintiff's title and to quiet the same, or for partition or sale as their respective interests might appear. Answers were filed; defendants De Graffenreid and Creek Land & Improvement Company each relying on their respective deeds aforesaid, and Viola Brown Mathews relying on her right to one-fifth of the land as a sister and heir of Castella Brown. The case was tried by the court on the pleadings, disclosing substantially as stated, and the following agreed statement of facts:

"It is agreed by and between the parties to this case that this cause may be submitted to the court and tried upon the pleadings and the following statement of facts, as all of the facts applicable to a determination of this controversy. Said facts being as follows:

"(1) Castella Brown was a duly enrolled citizen of the Creek Nation, not of Indian blood, and was enrolled as a freedman.

"(2) That she was the lawful and acknowledged wife of Ben

Reeves, mentioned in the pleadings, and was such lawful and acknowledged wife of Ben Reeves at the date of her death on June 7, 1902.

"(3)   That Castella Brown, as such citizen of the Creek Nation, made selection of her allotment on April 22, 1899, and received on that date, from the Commission to the Five Civilized Tribes, a certificate for the same, No. 1,330.

"(4)   That on September 22, 1904, a patent describing the W. ½ of the S. E. ¼ and the N. E. ¼ of the S. E. ¼, section 9, township 18 N., range 18 E., lying in the Creek Nation, being 120 acres of land selected by Castella Brown as above, said———— was executed and delivered to the heirs of Castella Brown, deceased.

"(5)   That on September 22, 1904, a patent describing the S. E. ¼ of the S. E. ¼ of section 9, township 18 N., range 18 E., being the homestead and part of the land selected aforesaid by Castella Brown, deceased, by the Principal Chief of the Creek Nation and approved by the Secretary of the Interior.

"(6)   That Ben Reeves, the husband of Castella Brown, was not an enrolled citizen of the Creek tribe of Indians, but lived and resided in the Creek Nation, and had lived and resided in the Creek Nation for a number of years before the death of his said wife.

"(7)   That the Creek Nation or tribe of Indians had a form of government, republican in form, had a written Constitution providing for the three co-ordinate branches of government, to wit:   the executive, judicial, and legislative, that the Principal Chief was the principal executive officer, that the National Council was the legislative body, and that the Supreme Court and the district courts were the judicial bodies.

"(8)   That the Creek Nation as a political sovereignty had a written and codified form of laws, and that the complaint filed by plaintiff gives a correct copy of the Creek law applicable to the descent and distribution of the estate of Castella Brown, deceased, as contained in the Creek printed statutes.

"(9)   It is also agreed that the Constitution of the Creek Nation, as in force at the times mentioned in the complaint, under article 3 of the Constitution, as shown by section No. 1, is as follows: 'The supreme law-defining power in this nation shall be lodged in the high court, to be composed of five (5) competent, recognized citizens of the Muskogee Nation, who shall have

attained the age of twenty-five years.   They shall be chosen by the National Council for a term of four years, and shall be paid as provided for by law.'

"(10) . It is also agreed that there was, in fact, a legally organized and constituted Supreme Court of the nation, and that said Supreme Court of the Creek Nation, at its October term, 1893, in the case of *Edward Gibson v. J. P. Davison et al.,* delivered a written opinion, a copy of which is filed as part of this agreed state of facts, and attached hereto as Exhibit A, said written opinion being a copy from the records of the Supreme Court of the Creek Nation.   And it is further agreed that on October 22, 1896, in answer to a question propounded to it by the National Council of the Muskogee Nation, the Supreme Court of that nation delivered a written opinion, a copy of which, from the records of said court, is hereto attached, and made a part of this 'agreed state of facts,' marked 'Exhibit B.'

"(11)   Ben Reeves is a native-born citizen of the United States, and was such citizen at the date of the death of his wife, Castella Reeves.

"(12)   It is agreed that the various deeds and conveyances alleged in the complaint to have been made by the persons therein mentioned were in fact executed and delivered as alleged in the complaint.

"(13)   The National Council of the Creek Nation, as approved April 6, 1894, enacted the following law, which was in force at the times mentioned in the pleadings, to wit:

" 'Noncitizens, Intermarried—Courts to Have Jurisdiction of the Property.

" ' Sec. 76.   The courts of this nation shall have and exercise jurisdiction over all controversies arising out of or pertaining to property rights acquired in this nation, and situated in the same by noncitizens who have intermarried with citizens of this nation and by reason of such marriage secured rights and privileges in this nation under which said property was acquired and accumulated by them.   The jurisdiction of our courts shall extend to controversies over property and property rights acquired by intermarried noncitizens of our nation, who by virtue of this intermarriage with citizens, acquired such property rights and privileges and that irrespective of whether such controversies are between noncitizens and citizens of the Muskogee Nation or be-

tween any persons whomsoever, who claim in this nation property rights under and through such intermarried noncitizens which are by them acquired in the manner aforesaid; and all persons hereafter intermarrying with citizens of this nation shall thereby be deemed to consent that the courts of this nation exercise all jurisdiction over property rights and privileges that they acquire in this nation by virtue of their said marriage.

" 'Sec. 77. All property brought into this nation by noncitizens in consequence of intermarriage of such noncitizens with citizens of this nation shall likewise be under the jurisdiction of the courts of this nation.

" 'Approved April 6, 1904.'

"Made by the counsel for all parties on this May 10th, 1907.

"GIBSON & RAMSEY,
"Attorneys for Defendant De Graffenreid.

"THOMAS & DE MEULES,
"Attorneys for Plaintiff .

"WEST & MELLETTE.
"Attorneys for Defendant Creek Land & Imp. Co."

On May 11, 1907, the court decreed, in effect, that the devolution of the land in controversy was governed by the Creek law of descent and distribution and passed in fee to Cynthia Tolliver, mother of Castella Brown, deceased, and from her to the plaintiff, the Iowa Land & Trust Company; that Ben Reeves, the husband of Castella Brown, being a noncitizen of the Creek Nation, could not inherit from his wife, who was a citizen; that George Brown, the father of Castella Brown, deceased, for the same reason could not inherit, and ordered that the deed from Ben Reeves to defendant De Graffenreid and the deed from Shellie Brown to Allen, Calfee, and Hart, and from them and their respective wives to defendant the Creek Land & Improvement Company, be removed as a cloud upon the title of the plaintiff, the Iowa Land & Trust Company. On May 13, 1907, defendants De Graffenreid and Creek Land & Improvement Company sued out a writ of error, and prosecuted their cause to the United States Court of Appeals in the Indian Territory, and the same is now before us

for review by virtue of the terms of the enabling act (June 16, 1906, c. 3335, 34 Stat. 267.)

*Frank Scruggs, N. A. Gibson,* and *George S. Ramsey,* for plaintiff in error De Graffenreid.

*West & Mellette,* for plaintiff in error Creek Land & Imp. Co.

*C. L. Thomas* and *Edgar A. De Meules,* for defendant in error.

TURNER, J. (after stating the facts as above). Before determining the devolution of the allotment of Castella Brown let us determine its legal status prior to her death.

The Indian appropriation bill of March 3, 1893 (27 Stat. 645, c. 209) provides:

"Sec. 15. The consent of the United States is hereby given to the allotment of lands in severalty not exceeding one hundred and sixty acres to any one individual within the limits of the country occupied by the Cherokees, Choctaws, Chickasaws and Seminoles; * * * and upon the allotment of the lands held by said tribes the reversionary interests of the United States therein shall be relinquished and shall cease.

"Section 16. The President shall nominate and, by and with the advice and consent of the Senate, shall appoint three commissioners to enter into negotiations with the Cherokee Nation, the Choctaw Nation, the Chickasaw Nation, the Muskogee (or Creek) Nation, and the Seminole Nation, for the purpose of the extinguishment of the national or tribal title to any lands within that territory now held by any and all such nations or tribes, either by cession of the same or some part thereof to the United States, or by the allotment and division of the same in severalty among the Indians of such nations or tribes respectively as may be entitled to the same, or by such other method as may be agreed upon between the several nations and tribes aforesaid, or each of them, with the United States, with a view to such an adjustment, upon the basis of justice and equity, as may with the consent of such nations or tribes of Indians, so far as may be necessary, be requisite and suitable to enable the ultimate creation of a state or states of the Union which shall embrace the lands within said Indian Territory."

Accordingly, this commission, hereafter called the "Dawes

De Graffenreid *et al.* v. Iowa Land & Trust Co.

Commission," was appointed, and entered on the discharge of its duties, and under the sundry civil appropriation act of March 2, 1895 (28 Stat. 939, c. 189), two additional members were appointed. Pursuant to a resolution of the Senate of the United States of March 29, 1894, this commission visited the Indian Territory, and reported back to that body May 7, 1894 (Senate Report No. 377, 53rd Congress, 2d Sess.) in full as to the condition of the Five Civilized Tribes. Afterwards its annual report (Sen. Misc. Doc. No. 24, 3d Sess, 53d Cong.) in part says:

"All the functions of the so-called governments of these five tribes have become powerless to protect the life or property rights of the citizen. The courts of justice have become helpless and paralyzed. * * *

"The day of isolation has passed. Not less regardless have they been of the stipulation in their title that they should hold their territory for common and equal use of all their citizens. Corruption of the grossest kind, openly and unblushingly practiced, has found its way into every branch of the service of the tribal governments. All branches of the governments are reeking with it, and so common has it become that no attempt at concealment is thought necessary. * * *

"The United States also granted to these tribes the power of self-government, not to conflict with the Constitution. They have demonstrated their incapacity to so govern themselves, and no higher duty can rest upon the government that granted this authority than to revoke it when it has so lamentably failed."

In the Indian appropriation bill of June 10, 1896 (29 Stat. 339, c. 398), the commission was "directed to continue the exercises of the authority already conferred upon them by law and endeavor to accomplish the objects heretofore prescribed to them and report from time to time to Congress, * * * *" and it was further provided "that said commission is further authorized and directed to proceed at once to hear and determine the application of all persons who may apply to them for citizenship in any of said nations, and after said hearing they shall determine the right of said applicant to be so admitted and enrolled." By the act of June 7, 1897 (3 Stat. 84, c. 3), it was provided:

"That said commission shall continue to exercise all authority heretofore conferred on it by law to negotiate. with the Five tribes, and any agreement made by it with any one of said tribes, when ratified, shall operate to suspend any provisions of this act if in conflict therewith as to said nation."

On September 27, 1897, pursuant to this authority, the Dawes Commission made an agreement with certain commissioners representing the Creek Nation, providing for the enrollment of its citizens and the allotment of its lands in severalty among them. This agreement was, according to stipulation, afterwards submitted to and rejected by the Creek Council, and, as such, never became operative between the parties. In the meantime, and in view, no doubt, of the condition in which the territory would be left by a failure to ratify this and other agreements pending with other tribes, Mr. Curtis of the Indian committee of the House prepared a bill, designed to transfer the control of the property rights of the Five Civilized Tribe from those nations to the United States. The result was the passage by Congress of an act entitled "An act for the protection of the people of the Indian Territory and for other purposes," approved June 28, 1898 (30 Stat. 495, c. 517), known as the "Curtis Bill." That act provides: ·

"Sec. 30. That the agreement made by the commission to the Five Civilized Tribes with the commission representing the Muskogee (or Creek) Tribe of Indians on the 27th day of September, eighteen hundred and ninety-seven, as herein amended, is hereby ratified and confirmed, and the same shall be of full force and effect if ratified before the 1st day of December, eighteen hundred and ninety-eight, by a majority of the votes cast by the members of said tribe at an election to be held for that purpose; and the executive of said tribe is authorized and directed to make public proclamation that said agreement shall be voted on at the next general election, to be called by such executive for the purpose of voting on said agreement; and if said agreement as amended be so ratified, the provisions of this act shall then only apply to said tribe where the same do not conflict with the provisions of said agreement; but the provisions of said agreement, if so ratified, shall not in any manner affect the provisions of section 14 of this act, which

said amended agreement is as follows:  [Setting forth the agreement.]"

Thus it will be seen that, in addition to section 11, which, in effect, provided for the surface allotment of the lands of the Creek Nation without the consent of the tribe, it provided for the resubmission, with certain modifications, of the agreement of September 27, 1897, for ratification by vote of the Creek people, and that, if ratified, its provisions, so far as they differed from the bill, should supersede it.  After much delay an election was finally called for November 1, 1898, and the agreement submitted in its amended form, as set forth in said act, but which failed of ratification by some 150 votes.  On April 1, 1899, after said agreement was thus defeated, under rules prescribed by the Department of the Interior, the Dawes Commission opened the land office at Muskogee "* * * to give effect to the provisions of said act according to its design, and to enable every member of the Creek tribe to select and have set apart to him lands to be allotted to him in amount approximating his share" of the lands of the tribe.

On April 22, 1899, Castella Brown, being a regularly enrolled freedman and citizen of the Creek Nation, but not of Indian blood, and as such entitled to do so, made selection and took her allotment on the lands in controversy in this cause and received from said commission a certificate of allotment therefor numbered 1,330, and, so far as this record discloses, entered upon and took possession of the land.  This was done pursuant to the terms of the Curtis bill, which reads:

"Sec. 11.  That when the roll of citizenship of any one of said nations or tribes is fully completed as provided by law, and the survey of the lands of said nation or tribe is also completed, the commission heretofore appointed under acts of Congress, and known as the 'Dawes Commission' shall proceed to allot the exclusive use and occupancy of the surface of all the lands of said nation or tribe susceptible of allotment among the citizens thereof, as shown by said roll, giving to each, so far as possible, his fair and equal share thereof, considering the nature and fertility of the soil, location, and value of same  *  *  *"

On March 8, 1900, said commission negotiated another agreement with the representatives of the Creek Nation, which, as amended, was approved by Congress (act March 1, 1901, c. 676, 31 Stat. 863), and which was, on May 25, 1901, ratified by the Creek Council, and thereby became effective, and known as the "Original Agreement." Section 6 provides:

"All allotments made to Creek citizens by said commission prior to the ratification of this agreement, as to which there is no contest, and which do not include public property, and are not herein otherwise affected, are confirmed, and the same shall, as to appraisement and all things else, be governed by the provisions of this agreement; and said commission shall continue the work of allotment of Creek lands to citizens of the tribe as heretofore, conforming to provisions herein; and all controversies arising between citizens as to their right to select certain tracts of land shall be determined by said commission."

Now, on the day of her death, with this certificate and this act of Congress relating thereto as her only muniments of title to the land allotted, of what did she die seised? There can be no doubt that the certificate alone vested in her an equitable estate in fee to the lands. In order to procure it she had caused herself to be enrolled as a Creek freedman, had appeared before the commission to the Five Civilized Tribes, authorized by law to make allotments, had selected the lands upon which she desired to file, and had been filed thereon by the commission and had received a certificate from the chairman of the commission to that effect, describing the lands. Nothing required by law remained to be done to pass to her the entire title of the Creek Nation and the "reversionary interest" of the United States except the delivery of the patent.

A very close analogy lies between the method of acquiring title to the land in controversy and that of acquiring title to the public lands of the United States. 26 Am. & Eng. Enc. of Law, p. 403, says:

"A person who has acquired a complete right to a patent for public lands, but to whom a patent has not been issued, is usually

regarded as an equitable owner, the United States or the state holding the naked legal title in trust for him."

In *Wisconsin Central Railroad Co. v. Price Company*, 133 U. S. 496, 10 Sup. Ct. 341, 33 L. Ed. 687, Mr. Justice Field, in delivering the opinion of the court, in substance, stated: After public lands have been entered at the land office and a certificate of entry obtained, they are private property, the government agreeing to make conveyance as soon as taken, and in the meantime holding the naked legal title in trust for the purchaser, who has the equitable title.

In *Carroll v. Stafford*, 3 How. (U. S.) 441, 11 L. Ed. 671, the court said:

"When the land was purchased and paid for it was no longer the property of the United States, but of the purchaser. He held for it a final certificate. * * * It is said the fee is not in the purchaser, but in the United States, until the patent shall be issued. This is so, technically, at law, but not in equity. The land in the hands of the purchaser is real estate, descends to his heirs, and does not go to his executors or administrators. In every legal and equitable aspect it is considered as belonging to the realty."

In *Wirth v. Branson*, 98 U. S. 118, 25 L. Ed. 86, the Supreme Court of the United States said:

"This rule is well settled, by a long course of decisions, that when public lands have been surveyed and placed in the market, or otherwise opened to private acquisition, a person who complies with all the requisites necessary to entitle him to a patent in a particular lot or tract is to be regarded as the equitable owner thereof, and the land is no longer open to location."

The certificate of allotment in this case bears a very close analogy to the certificate of entry to public lands of the United States. In *Witherspoon v. Duncan*, 4 Wall (U. S.) 210-218, 18 L. Ed. 339, the court said:

"In no just sense can lands be said to be public lands after they have been entered at the land office and a certificate of entry obtained. If public lands before the entry, after it they are private property. * * * The contract of purchase is complete when

the certificate of entry is executed and delivered, and thereafter the land ceases to be a part of the public domain. The government agrees to make proper conveyance as soon as it can, and in the meantime holds the naked legal fee in trust for the purchaser who has the equitable title."

See, also, *Railroad Co. v. Prescott*, 16 Wall, (U. S.) 603-608, 21 L. Ed. 373; *Railroad Co. v. McShane*, 22 Wall. (U. S.) 444-461, 22 L. Ed. 747.

In *Porter v. Parker*, 68 Neb. 338, 94 N. W. 123, there was an allotment of land under the following statute:

"That upon the approval of the allotments provided for in the preceding section by the Secretary of the Interior he shall cause patents to issue therefor in the name of the allottees which patents shall be of the legal effect and declare that the United States does and will hold the land thus allotted for the period of twenty-five years in trust for the sole use and benefit of the Indian to whom such allotment shall have been made or in case of his decease, of his heirs, according to the laws of the state of Nebraska, and at the expiration of said period the United States will convey the same by patent to said Indian or his heir as aforesaid, in fee discharged of said trust. * * *"

In passing on it the court held:

"In our opinion, an allottee and patentee of lands in severalty, pursuant to the above-mentioned act of Congress, is seised of an equitable interest and estate in fee, which upon his death before the issuance of a final patent therefor by the United States, descends to his heir or heirs at law according to the laws of inheritance of this state."

In *Carter v. Ruddy*, 56 Fed. 542, 6 C. C. A. 3, the question came up on an action of ejectment. Plaintiff in error, plaintiff below, claimed title by deed from one Walter Bourke who was a half-breed Sioux Indian, to whom was issued scrip under the act of July 17, 1854 (10 Stat. 304, c. 83), entitled "An act to authorize the President of the United States to cause to be surveyed the tract of land in the territory of Minnesota belonging to the half-breeds or mixed bloods of Dakota or Sioux Nation of Indians, and for other purposes." The act authorizes the President to exchange,

for a relinquishment of the interest of said Indians, derived by the ninth article of the treaty of Prairie du Chien of the act of July 15, 1830 (7 Stat. 330), certificates or scrip for the same amount of land to which each Indian would be entitled in case of a division of the said reservation *pro rata* among the claimants, "which certificates or scrip may be located upon any of the lands within said reservation not now actually occupied by actual and *bona fide* settlers. * * * " In other words, the exchange was of a general title for the opportunity to acquire titles in severalty of specific tracts of said reservation, actually occupied by each Indian, or the right to acquire, acre for acre, other lands of the public domain not reserved, upon which improvements might be made. The scrip was not transferable. A piece of scrip for 80 acres issued under said act to Walter Bourke. In effect, the court held that this scrip conveyed the equitable title, and was not sufficient upon which to maintain an action of ejectment. The court said: "The scrip and its location were not the legal title. They were but the means of obtaining it. * * * It is well settled that one having only equitable title cannot maintain ejectment in the federal courts"—citing authorities.

In *Quinney v. Denney*, 18 Wis. 510, the Supreme Court of Wisconsin, in construing an act of Congress providing for the allotment of lands to the Stockbridge Indians, said:

"The principal and controlling question in the case is whether the respondent, as allottee under the act of Congress of March 3, 1843 (see 5 Stat. c. 101, p. 645), took such an estate in the premises allotted to him as he could convey by deed, or whether this conveyance to James Joshua in 1845 was void for want of assignable interest in the grantor. On the part of the respondent it is contended that the deed to Joshua passed no title, and that in fact the allottee under the act took no assignable interest in the land until the patent issued to him in 1860. We deem this an erroneous view of the effect of the act of Congress."

After setting forth the provisions of the act, the court said: "It appears that all the requirements of this law were complied

with up to the issuing of the patent for the lands by the President. Now we are of the opinion that this act created or gave to the allottee an equitable estate or title in the land allotted to him, which could be sold and transferred by deed, and that when the patent subsequently issued to him, it inured to the benefits of his grantee" —citing many authorities.

That these certificates were intended to convey only the equitable title, and hence might not be, before the patent issued, sufficient upon which to maintain an action of ejectment, and hence the allottee might be without remedy in the courts to obtain possession of his allotment, seems to have been in the purview of Congress when it provided in the Curtis bill:

"Sec. 29. The United States shall put each allottee in unrestricted possession of his allotment and remove therefrom all persons objectionable to the allottee."

And again in the act of March 1, 1901, as amended by the supplemental agreement:

"Sec. 8. The Secretary of the Interior shall, through the United States Indian agent in said territory, immediately after the ratification of this agreement, put each citizen who has made selection of his allotment in unrestricted possession of his land and remove therefrom all persons objectionable to him; and when any citizen shall thereafter make his allotment as herein provided, and receive a certificate therefor, he shall be immediately thereupon so placed in possession of his land.   *   *   *"

But it is contended, in effect, by plaintiff in error that section 6 of the "Original Agreement," *supra*, operated upon and was a confirmation of the selection of the allotment of Castella Brown, made under article 11 of the Curtis bill, and was, in effect, a legislative grant of the absolute title, both legal and equitable, to her of the lands so taken in allotment, and that the subsequent issuance of the patent to her or her heirs was mere evidence of title already conferred and added nothing thereto. In other words, it is contended that section 6 of this agreement intended to make all prior allottees favored objects of the law, and confer upon them

absolute and immediate title to their allotments by legislative grant, thereby placing them on a higher plane than those to come after them. Let us see whether section 6 will bear such a construction. Lewis' Sutherland Stat. Con. § 347, says:

"It is indispensable to a correct understanding of a statute to inquire, first, what is the subject of it, what object is intended to be accomplished by it? When the subject-matter is once clearly ascertained, and its general intent, a key is found to all its intricacies. * * *"

At the time this act was passed the Dawes Commission had been in existence for several years, negotiating with the Five Civilized Tribes with a view to making a roll of their citizens, and inducing them, by agreement to take their lands in severalty. The agreement of September 27, 1897, had failed of ratification by the Creek Council, had been embodied in the terms of the Curtis bill, and submitted for ratification to a vote of the Creek people, and had been rejected by them. Since the opening of the Creek allotment office on April 1, 1899, up to June 30, 1901, 10,617 persons appeared before the commission, and made application to select allotments. Of this number 9,557 received a preliminary allotment of 160 acres, and 1,060 made partial selections. The selections made up to and including June 30, 1901, covered an acreage of 1,626,917 acres. Up to the time of the ratification of this original agreement (May 25, 1901,) these allotments were made under the general provisions of the Curtis bill, for the reason that the agreement of September 27, 1897, had failed of ratification, and, inasmuch as it was the policy of the United States to accomplish allotment "with the consent of such nations or tribes of Indians, so far as may be necessary," and inasmuch as a vast number of allotments had then been made without the consent of the Creek people, in order to put the legal efficacy of those allotments beyond question and to save, perhaps, the United States the vast labor and expense of making them over again and to thus facilitate the work of the commission, section 6 was embodied in that agreement. In that section the commissioners were not deal-

ing with the subject of title to allotments, but with the work of making allotments. The matter of patent and the legal title to allotments was dealt with elsewhere in the agreement.

In construing this section, it is urged, in effect, that it should be done as though it read:

"[The titles to] all allotments made to Creek citizens by said commission prior to the ratification of this agreement, as to which [said allotments] there is no contest * * * are confirmed. * * *"

This cannot be done, for the reason that we believe the intent of that part of the section was to confirm the work of allotment already accomplished, as stated, and to provide that "said commission shall continue the work of allotment of Creek lands to citizens of the tribe as heretofore. * * *" We are not unmindful of the authorities cited in support of the proposition that the words of this section carry with them a legislative grant, but those were cases where the United States was vesting title to its own lands, and not to lands of another, in which, according to the act of March 3, 1893, it only claimed a "reversionary interest." Besides, this very agreement, under the head of "Titles," specifically provides how the legal title shall be obtained:

"Sec. 23. Immediately after the ratification of this agreement by Congress and the tribe, the Secretary of the Interior shall furnish the Principal Chief with blank deeds necessary for all conveyances herein provided for, and the Principal Chief shall thereupon proceed to execute in due form and deliver to each citizen who has selected or may hereafter select his allotment, which is not contested, a deed conveying to him all right, title and interest of the Creek Nation and of all other citizens in and to the lands embraced in his allotment certificate. * * * All conveyances shall be approved by the Secretary of the Interior, which shall serve as a relinquishment to the grantee of all the right, title, and interest of the United States in and to the lands embraced in his deed. * * *"

Furthermore, upon the face of section 6 no such intention appears; and when we remember that said section comprises a

Vol. 20—45

part of an agreement with a simple and dependent people, which was submitted to them for their approval, it would be manifestly unfair to construe it in any other manner than that in which it was obviously understood by them at that time, taking the terms employed in their common and ordinary acceptation. Such, it seems, is the rule of construction of instruments owing their force and effect to the ratification of the people, and such shall be our rule of interpretation in this case. In speaking of the Constitution of the state, the court, in *Manly v. State*, 7 Md. 135, said.

"The whole must be considered with a view to ascertain the sense in which the words were employed, and its terms must be taken in their ordinary and common acceptation, because they are presumed to have been so understood by the framers and by the people who adopted it. This is unquestionably the correct rule of interpretation. It  *  *  *  owes its whole force and authority to its ratification by the people, and they judged of it by the meaning apparent on its face, according to the general use of the words employed, where they do not appear to have been used in a legal or technical sense."

In *State v. Mace*, 5 Md. 337, the court said:

"Although it is a well-recognized canon of construction that where legal terms are used in a statute, they are to receive their technical meaning, unless the contrary plainly appears to have been the intention of the Legislature, the principle, however, does not apply to the interpretation of the organic law, which is to be construed, according to the acceptation of those who adopted it, as the supreme rule of conduct, both for officials and individuals; and, in conformity with this view, it has been habitual for the supreme judiciary of the United States to derive light and instruction from the commentaries from the framers of the federal Constitution."

Cooley's Constitutional Limitations, 101, says:

"*  *  *  For as the Constitution does not derive its force from the convention which framed, but from the people who ratified it, the intent to be arrived at is that of the people; and it is not to be supposed that they have looked for any dark or abstruse meaning of the words employed, but rather that they have accepted them in the sense most obvious to the common understanding, and ratified the instrument in the belief that that was the sense de-

signed to be conveyed." *K. Hobart Hills v. City of Chicago*, 60 Ill. 86.

To give to section 6 the construction contended for would seem to defeat the intent of the agreement which undoubtedly was to give to no citizen of the Creek Nation the advantage of another citizen in the equal distribution of the common property; and hence we repeat that said section should be construed as the people adopting it, no doubt, understood it at that time, which was that the allotments made to Creek citizens prior thereto, "as to which there is no contest, and which do not include public property, and are not herein otherwise affected, are confirmed"—that is, are to stand as made, and need not be made over again, and, as made, are to stand on equal footing with those to be made under that agreement——and that "the commission shall continue the work of allotment, as heretofore, conforming to the provisions herein." Thus it will be seen that at the time of her death Castella Brown had received her allotment, and stood seised in fee of the equitable title thereto; that nothing remained to be done, except the formal execution and delivery of the patent, to vest in her the legal title, and that section 6, *supra,* added nothing thereto.

The subsequent execution and delivery of the patent to the heirs of Castella Brown, deceased, which was done September 22, 1904, describing surplus and homestead, was a mere ministerial act by which the title to the lands described therein inured to and vested in her heirs or their grantees. *John J. Oliver et al. v. Robert Forbes,* 17 Kan. 113.

"Where an ancestor holds land by entry and survey, and has done all acts necessary to entitle him to a patent, he acquires an inchoate and alienable title which, upon his death, descends to his heirs; and where a patent afterwards issues to his heirs, they take the completed title by descent, and not by purchase." (26 Am. & Eng. Enc. of Law, 431, and cases cited.)

To put this beyond question as to the public lands of the United States, to which the lands in controversy bear a close analogy, the Revised Statutes of the United States provides:

"Sec. 2448. Where patents for public lands have been or

may be issued, in pursuance of any law of the United States, to a person who had died or who hereafter dies before the date of such patent, the title to the land designated therein shall inure to and become vested in the heirs, devisees or assignees of such deceased patentee as if the patent had issued to the deceased person during life." (U. S. Comp. St. 1901, p. 1512.)

So it would seem that, whether the patent issued to Castella Brown after her death, or to her heirs after her death, the result would have been the same. The absolute fee-simple title to the lands in question would, in either event, have vested in her heirs. *Wm. H. Clark v. Abbie S. Lord*, 20 Kan. 390. This statute, it has been held, was "intended to cover all cases where any rights belonging to the United States existed in lands which could be relinquished by patent, even though the lands were not strictly public lands, and an interest therein was held by the patentee himself." (26 Am. & Eng. Enc. of Law, 433, and cases cited.) But to put this matter beyond a peradventure, the act of Congress of April 26, 1906 (34 Stat. 138 c. 1876), known as the "Second Curtis Bill," provides:

"Sec. 5. That all patents or deeds to allottees in any of the Five Civilized Tribes to be hereafter issued shall issue in the name of the allottee, and if any such allottee shall die before such patent or deed becomes effective, the title to the lands described therein shall inure to and vest in his heirs, and in case any allottee shall die after restrictions have been removed, his property shall descend to his heirs or his lawful assigns, as if the patent or deed had issued to the allottee during his life, and all patents heretofore issued, where the allottees died before the same became effective shall be given like effect; and all patents or deeds to allottees and other conveyances affecting lands of any of said tribes shall be recorded in the office of Commissioner to the Five Civilized Tribes, and when so recorded shall convey legal title, and shall be delivered under direction of the Secretary of the Interior to the party entitled to receive the same: Provided, the provisions of this section shall not affect any rights involved in contests pending before the Commissioner to the Five Civilized Tribes of the Department of the Interior at the date of approval of this act."

Having thus determined that at the time of her death Castella

Brown was seised of an equitable estate in fee to the lands in question, which, upon the execution and delivery of the patent thereto after her death, ripened into an absolute estate in fee for the benefit of her heirs, let us next determine what law of descent and distribution is to determine the devolution of this allotment. It is contended by plaintiff in error Creek Land & Improvement Company that at the time of her death, June 7, 1902, "the Arkansas statute of descent and distribution, as embraced in chapter 49 of Mansfield's Digest (Ind. T. Ann. St. 1899, c. 21), and interpreted by the decision of the Supreme Court of Arkansas, was in force in the Creek Nation of the Indian Territory, and controlled the descent and devolution of the title to the property involved in this controversy." With this contention we cannot agree. We think it sufficient to say that if these laws were ever applicable to the devolution of real property in the Creek Nation, they were repealed by implication by sections 6, 7, and 28 of the act of March 1, 1901, called the "Original Agreement." As stated, this agreement was ratified May 25, 1901. The report of the Dawes Commission shows that from April 1, 1899, the date of the opening of the allotment office at Muskogee, up to June 30, 1901, 10,617 persons had appeared before it, and made application to select allotments. Of this number 9,557 received preliminary allotments of 160 acres, and 1,060 made partial selection, covering in all 1,626,917 acres, Section 6, of that act confirmed those allotments, and of necessity that many enrollments, and provided that they "* * * shall, as to appraisement and all things else (which includes as to how they shall go on descent cast) be governed by the provisions of this agreement; and said commission shall continue (not go behind) the work of allotment of the Creek lands to citizens of the tribe as heretofore, conforming to provisions herein. * * * " This fixed the status of those allotments, including that of Castella Brown. Then as if to dispose of the whole subject of the descent of all allotments which had been made or would be made thereunder before descent cast, the agreement provides:

"Sec. 7.  Land allotted to a citizen hereunder (which includes that of Castella Brown) shall not in any manner whatsoever or at any time, be incumbered, taken, or sold to secure or satisfy any debt or obligation contracted or incurred prior to the date of the deed to the allottee therefor and such lands shall not be alienable by the allottee or his heirs at any time before the expiration of five years from the ratification of this agreement, except with the approval of the Secretary of the Interior. * * * (Limitation.)  Each citizen shall select from his allotment forty acres of land as a homestead, which shall be nontaxable and inalienable and free from any incumbrance whatever for twenty-one years (another), for which he shall have a separate deed, conditioned as above:  Provided, * * * the homestead of each citizen shall remain, after the death of the allottee, for the use and support of children born to him after the ratification of this agreement, but if he have no such issue (Castella Brown had none) then he may dispose of his homestead by will (she made none) free from limitation herein (the last above) imposed, and if this be not done (no will made) the land (What land?  The homestead?  No, or it would have said so.  What lands are we talking about?  Lands allotted to citizens hereunder—the whole allotment)  shall descend to his heirs according to the laws of descent and distribution of the Creek Nation, free from such limitation."

What limitation?  The last above on the homestead.  Hence, as the lands in controversy were "lands allotted" within the purview of the first words of this section, they fell squarely within it, and their devolution is governed according to the laws of descent and distribution of the Creek Nation in force at the time of the death of Castella Brown.

But there was a vast number of citizens of the Creek Nation who were entitled to be enrolled when the land office opened April 1, 1899, but who, up to the time of making this agreement had not been enrolled, several of whom had died, and others who might die before receiving their allotments.  Accordingly it was provided in the same agreement:

"Sec. 28.  All citizens who were living on the first day of April, eighteen hundred and ninety-nine, entitled to be (not those who had been) enrolled under (section 21 of the Curtis Bill) shall

be placed upon the rolls to be made (the names already enrolled were to stand) by said commission under said act of Congress, and if any such citizen (i. e., one entitled to enrollment on April 1, 1899) has died since that time, or may hereafter die, before receiving his allotment of land and distributive share of all of the funds of the tribe, the lands, and money to which he would be entitled, if living, shall descend to his heirs according to the laws of descent and distribution of the Creek Nation, and be allotted and distributed to them accordingly."

In short, sections 6 and 7 of this agreement fix the descent of the allotment (both surplus and homestead) in cases where the allottee receives his allotment before he dies, and section 28 fixes it in cases where he dies before receiving his allotment. In either case it was intended to "descend to his heirs according to the laws of descent and distribution of the Creek Nation." This, we think, is a literal construction of these sections, as was intended. "The land" referred to in section 7, and "the lands" referred to in section 28, mean one and the same thing, and both have reference to the entire allotment. This meaning must be given to "the land" referred to in section 7, in order to carry out the intention of Congress. To confine it as simply referring to the homestead would convict Congress of a grave oversight, or as intending an absurdity, in that under both statutes the homestead would descend under the laws of descent and distribution of the Creek Nation. Under section 28 the surplus would also so descend, while under section 7 the surplus would descend under the laws of descent and distribution of Arkansas, as set forth in chapter 49 of Mansfield's Digest (Ind. T. Ann. St. 1899, c. 21). This would create endless confusion, and hence we will not attribute to Congress any such intention. Black on Interpretation of Laws (section 30) says:

"Every statute is construed with reference to its intended scope and the purpose of the Legislature in enacting it; and when the language is *ambiguous, or admits of more than one meaning,* it is to be taken in such a sense as will conform to the scope of the act and carry out the purpose of the statute."

The scheme was a complete provision for the devolution of

real property taken or to be taken in allotment under the terms of this agreement, and therefore repealed chapter 49 of Mansfield's Dig. (Ind. T. Ann. St. 1899, c. 21), if the same was ever in force in the Creek Nation; but on this we express no opinion.

But it is contended that before the death of Castella Brown, the Indian appropriation bill, approved May 27, 1902 (32 Stat. 258, c. 888), substituted the laws of descent and distribution of Arkansas for those of the Creek Nation provided for in the "Original Agreement," by the following provisions: "And provided further, that the act entitled 'An act to ratify and confirm an agreement with the Muskogee or Creek Tribe of Indians, and for other purposes,' approved March 1, 1901, in so far as it provides for descent and distribution according to the laws of the Creek Nation is hereby repealed and the descent and distribution of lands and moneys provided for in said act shall be in accordance with the provisions of chapter 49 of Mansfield's Digest of the Statutes of Arkansas in force in Indian Territory" and that the same should govern in this case. It would seem that the point is well taken, were it not for the following joint resolution passed on the date the above was approved, and which makes said act effective only "from and after July 1, 1902," a date subsequent to the death of Castella Brown:

"Resolved by the Senate and House of Representatives of the United States of American in Congress assembled, that the act entitled 'An act making appropriations for the current and contingent expenses of the Indian Department and fulfilling treaty stipulations with the various Indian tribes for the fiscal year ending June thirtieth, nineteen hundred and three, and for other purposes,' shall take effect from and after July first, nineteen hundred and two, except as otherwise specifically provided therein."

As we can find nothing in the act referred to wherein it is "specifically provided" that the laws of descent and distribution of Arkansas should be immediately effective, we conclude that such was not the intent; and therefore that part of the Indian appropriation bill, *supra,* approved May 27, 1902, does not affect our inquiry in this case.

Now, who were the heirs of Castella Brown under the Creek law of descent and distribution at the time of descent cast? The agreed statement of facts recites:

"(4)  That on September 22, 1904, a patent describing the West ½ of the S. E. ¼ and the N. E. ¼ of the S. E. ¼ of section 9, township 18 N., range 18 E., lying in the Creek Nation, being 120 acres of the land selected by Castella Brown as above said was executed and delivered to the heirs of Castella Brown, deceased.

"(5)  That on September 22, 1904, a patent describing the S. E. ¼ of the S. E. ¼ of section 9, township 18 N., range 18 E., being the homestead and part of the land selected aforesaid by Castella Brown, was executed to the heirs of Castella Brown, deceased, by the Principal Chief of the Creek Nation, and approved by the Secretary of the Interior."

From which we infer that the patent issued "to the heirs of Castella Brown, deceased," leaving it to judicial construction as to who they were, and the distributive share of each. *Clark v. Lord*, 20 Kan. 390. It is further agreed:

"(8)  That the Creek Nation, as a political sovereignty, had a written and codified form of laws, and that the complaint filed by plaintiff gives a correct copy of the Creek law applicable to the descent and distribution of the estate of Castella Brown, deceased, as contained in the Creek printed statutes."

Turning to the complaint, we find those Creek laws of descent and distribution to be:

"Sec. 6  Be it further enacted that if any person die without a will, having property and children, the property shall be equally divided among the children by disinterested persons and in all cases where there are no children, the nearest relation shall inherit the property."

"Sec. 8.  The lawful or acknowledged wife of a deceased husband shall be entitled to one-half of the estate, if there are no other heirs, and an heir's part if there should be other heirs in all cases where there is no will. The husband surviving shall inherit of a deceased wife in like manner."

"Sec. 1.  All noncitizens not previously adopted, and being married to citizens of this nation, or having children entitled

to citizenship, shall have the right to live in this nation and enjoy all privileges enjoyed by other citizens, except in participation in the annuities and final participation in the lands."

It is urged by Creek Land & Improvement Company that this law does not provide a complete and intelligent system by which the property of deceased Creek citizens can be distributed, or which the courts can enforce, for the reason, as is contended, that the Creeks, up to the time of allotment, had no such thing as an individual ownership of land in the Creek Nation, but a bare right of possession and use, a simple chattel interest, which passed like other personal property. As a historical fact we have no doubt the statement is true, but as Congress has declared that these lands shall descend "according to the laws of descent and distribution of the Creek Nation," we will not stop to comment upon the wisdom of the act, but proceed, as is our duty, to carry the same into effect "to the best of our learning and ability."

As Castella Brown died intestate without child or the issue of child or children her surviving, leaving her surviving a husband, father, and mother, three sisters, and a brother, let us first determine which of them is her "nearest relation," for such must inherit the property under section 6, *supra*. Webster's International Dictionary (1907) defines the word "relation" to be "a person connected by consanguinity or affinity; a relative; a kinsman or kinswoman." Bouvier's Law Dictionary defines a relative to be "one connected with another by blood or affinity; a relation; a kinsman; a kinswoman." Without doubt the "nearest relation" is meant by section 6 to be some one person, and that person to be neither husband nor wife of the deceased, as they are provided for in section 8. Besides it has been held by the great weight of authority that a husband cannot properly be considered a relative of his wife, or a wife a relative of her husband. Bacon on Benefit Societies and Life Insurance, § 260-a, says:

"There seems to be no authority for holding that the word 'relation,' in its strict, legal, and technical sense, includes husband or wife. On the contrary, authorities are found very di-

rect and explicit to the point that they are not relations. Thus in 2 Williams on Executors, p. 1004, it is laid down that: 'No person can regularly answer the description of relations but those who are akin to the testator by blood. A wife, therefore, cannot claim under a bequest of her husband's relations, nor a husband as a relation of his wife.' The Supreme Court of Pennsylvania (*Storer v. Wheatley's Ex'rs*, 1 Pa. 506) has decided that in a will the terms 'my nearest relations or connections,' do not include the testator's wife. The decision says: 'A wife is no more a relation of the husband than he is of himself.' The English rule is the same (14 Ves. 372). The word 'relations' includes only relations by blood, and not connections by marriage, even a husband or wife." (Citing authorities. *Kimball v. Story*, 108 Mass. 382; *Worsley v. Johnson*, 3 Atk. 761.)

"The phrases 'related to,' 'relations,' and 'next of kin,' whether used in a statute, will, or contract have, by a perfectly uniform course of decisions, been held to include only relations by blood, and not connections by marriage, not even a·husband or a wife." (*Sup. Council Or. Cho. Friends v. Bennett*, 47 N. J. Eq. 39, 19 Atl. 785.)

24 Am. & Eng. Enc. of Law, 278, says:

"The definition commonly given of 'relative' or 'relation' is 'a person connected with another by consanguinity or affinity'; but in view of the decisions it would seem that the word has not, technically, so extensive a meaning as this, and is more properly confined to connections by consanguinity alone [citing authorities]. It has been held frequently that in its strict technical sense the word 'relative' or 'relation' does not include a husband or a wife."

Neither is this "nearest relation" intended to be a child of the intestate, for the children are provided for in the same section; and, besides, it has been held that children are not relatives. *Hargadine v. Pulte*, 27 Mo. 423.

Then, if the term "nearest relation" excludes the husband and wife and the children, as Castella Brown had·her surviving a father and mother and sisters and a brother, let·us see which one of these fall within the terms. In *Swasey v. Jaques*, 144 Mass. 135, 10 N. E. 758, 59 Am. Rep. 65, Field, J., speaking for the court, said:

"It is certainly difficult to distinguish between the expressions 'next of kin,' 'nearest of kin,' 'nearest of kindred,' and 'nearest blood relations'; and primarily the words indicate the nearest degree of consanguinity.    *    *    *"

And so we are of the opinion that "nearest relations" indicates the "nearest degree of consanguinity," and is equivalent to "next of kindred." Therefore the inquiry is, which is "next of kindred" to Castella Brown, her father and mother, or her sisters and brothers? Chancellor Kent in volume 4 of the thirteenth edition of his Commentaries, p. 395, answers the question for us when the says: "  *    *    * But the next of kindred to the intestate, I presume, must be the parents, if living. They are nearer of kin than brothers and sisters.    *    *    *" And so we say that the parents of Castella Brown are her "nearest relations"; and now the question is, which one of them is her "nearest relation," Cynthia Tolliver, her mother, or George Brown, her father? The latter of whom is not before the court. In determining between the parents of Castella Brown as to which of them is her "nearest relation," and therefore entitled to take this inheritance, let us take a general view of the situation. In so doing we shall not exercise, although we have a very wide field of inquiry. In *Davison v. Gibson*, 56 Fed. 446, 5 C. C. A. 546, the court said:

"The court, in making up its opinion of the law of the case, is not limited in its researches to legal literature. It may consult works on collateral sciences or arts or history, touching the topic on trial, and may appeal to the public archives for this purpose." (Citing many authorities.)

On August 11, 1852, the United States, pursuant to treaty made with the Creeks on February 14, 1833, by patent ceded to Muskogee or Creek Nation in fee all the lands within the boundary heretofore claimed by that tribe within this state. That patent, in reciting said treaty, quotes: "Art. 3. The United States will grant a patent in fee simple to the Creek Nation for the land assigned said nation by this treaty of convention, whenever the same shall have been ratified by the President and Senate of the United

States . * * * "—and proceeds to convey the lands, "to have and to hold the same unto the said tribe of Indians so long as they shall exist as a nation and 'continue to occupy the country hereby assigned to them." Since then, as said in *Davidson v. Gibson, supra,* "the Creek Nation has been long recognized by the United States as 'a domestic dependent nation' (*Cherokee Nation v. Georgia,* 5 Pet. 1. 8 L. Ed. 25), as a state in a certain sense, although not a foreign state or 'a state of the Union (*Holden v. Joy,* 17 Wall. 211, 21 L. Ed. 523), as a distinct community, with boundaries accurately described (*Worcester v. Georgia,* 6 Pet. 515, 8 L. Ed. 483), and as a domestic territory (*Mackey v. Cox,* 18 How. 100, 15 L. Ed. 299). The right of local self-government has been accorded to the Creek Nation from the earliest times. The laws and customs of the nation adopted for the government and protection of the members thereof by birth or adoption have never been interfered with by the United States. Rights acquired under these laws and customs have been respected and enforced."

Furthermore, it is agreed in this case:

"(7) That the Creek Nation or tribe of Indians had a form of government republican in form, had a written Constitution providing for the three co-ordinate branches of government, to wit, the executive, judicial, and legislative, that the Principal Chief was the principal executive officer, that the national council was the legislative body, and that the Supreme Court and the district courts were the judicial bodies. (8) That the Creek Nation, as a political sovereignty, had a written and codified form of laws. * * * (9) It is also agreed that the Constitution of the Creek Nation, as in force at the times mentioned in the complaint under article 3 of the Constitution, as shown by section No. 1 is as follows: The supreme law-defining power in this nation shall be lodged in a high court, to be composed of five (5) competent, recognized citizens of the Muskogee Nation, who shall have attained the age of twenty-five years. They shall be chosen by the National Council for the term of four years, and shall be paid as provided for by law. (10) * * * There was, in fact, a legally organized and constituted Supreme Court of the nation, and that said Supreme Court of the Creek Nation. * * * "

Thus, although we see in the Creeks, at the time of the enactment of the statute under construction, a tribal form of government, with the fee to its lands in the tribe, yet we also see

in them a keen appreciation of the rights of property, hedged about by safeguards of law suitable to their condition. We also see that there existed among them from the earliest times the rights of separate property in the wife. In *Davison v. Gibson*, 56 Fed. 446, 5 C. C. A. 546, the court further says:

"In Col. Hawkins' History of the Creeks and Their Customs and Laws, published in the collections of the Georgia Historical Society (volume 3, pt. 1, p. 74) it is said: 'Marriage gives no right to the husband over the property of his wife and when they part she keeps the children and the property belonging to them.' * * * Mr. Schoolcraft makes substantially the same statement as Col. Hawkins, in reference to the customs and laws, on this subject of the Creek and some other nations in the Indian Territory. Schoolcraft's History of the Indian Tribes, pt. 1, p. 283."

Now let us see how, according to tribal customs, this property descends. Speaking of the tribal organization of the American Indian, "The American Race," by Daniel G. Brinton (1901), at page 45, says:

"The *gens* is 'an organized body of consanguineal kindred.' * * * An indeterminate number of these *gentes* make up the tribe; * * * each *gens* * * * electing its own chieftain, and deciding on all questions of property * * * within its own limits. Marriage within the *gens* is strictly prohibited, and descent is traced and property descends in the female line only. This is the ideal theory of the American tribal organization, and we may recognize its outlines almost anywhere on the continent. * * *"

The same work (page 48) says:

"Where maternal descent prevailed, it was she who owned the property of the pair, and could control it as she listed. It passed at her death to her blood relatives, and not to his. Her children looked upon her as their parent, but esteemed their father as no relation whatever."

The same work (page 85), in speaking of the Chahta-Mus-kokis, says:

"The gentile system, with descent in the female line, prevailed everywhere. The Creeks counted more than 20 *gentes*.

\* .\* \* In the town each *gens* lived in a quarter by itself, and marriage within the *gens* was strictly prohibited. \* \* \* The chief of each town was elected for life from a certain *gens,* but the office was virtually hereditary, as it passed to his nephew on his wife's side, unless there were cogent reasons against it."

In "A Migration Legend of the Creeks," by Albert S. Gat-schet of the United States Bureau of Ethnology, Washington, D. C. (volume 1, p. 153), in speaking under the head "The Creek Government," says:

"Among the Creeks, Seminoles, and all other Maskoki tribes descent was in the female line. Every child born belonged to the *gens* of its mother, and not to that of its father, for no man could marry into his own *gens.* In case of the father's death or incapacity the children were cared for by the nearest relatives of the mother."

The same work (page 156) says:

"Several *gentes,* with their families, united into one town or settlement, live under one chief, and thus constitute a tribe. \* \* \* The town elects him for life from a certain *gens.* \* \* \* When the miko dies the next kin in the maternal line succeeds him, usually his nephew. \* \* \* "

See, also, Coll. Ga. Hist. Society, vol. 1, p. 693. Also in Coll. Ga. Hist. Socy. p. 74, under the head of "Adultery," we find:

"They cut off the hair of the women, which they carry to the square in triumph. If they apprehend but one of the offenders and the other escapes, they go and take satisfaction from the *nearest relation.":*

In construing this statute (section 6), then, it will be seen that "nearest relation" is a term of peculiar meaning and great antiquity in the laws of that tribe, and in view of that fact, and that Castella Brown derived her inheritable blood from her mother, and not from her father, who was an intermarried noncitizen, would it be too much to attribute the intent of the lawmakers of that statute to be that the same should be so construed as to keep the property in the *gens* of the mother? We are fully persuaded that such construction was intended. Further, if these

parties were both citizens, by blood, of the tribe, would it be too much to say that the "nearest relation," as between the father and mother of the intestate, was intended to be that parent on the part of whom the property descended or was derived and into whose *gens* it should go on descent cast? With this construction this section would follow closely the idea of descent contained in chapter 18, § 1, Comp. St. D. C., and would be, by supplementing it with the law of the forum at the time of descent cast (*Davison v. Gibson, supra*), in substance:

"Sec. 6. Be it further enacted that if any person die without a will, having property and children, the property shall descend to the child or children and their descendents, if any, equally, and if no child or descendent, and the estate descended to the intestate on the part of the father, then to the father, and if no father living, then to the brothers and sisters of the blood of the father, etc. If the estate descended to the intestate on the part of the mother, then to the mother, and if no mother living, then to the brothers and sisters of the blood of the mother," etc.

We are therefore clearly of the opinion that the "nearest relation" in this case was intended to be Cynthia Tolliver, the mother of Castella Brown, the intestate, and that she is entitled, under section 6, to take the inheritance, unless the contention of the plaintiff in error De Graffenreid can be successfully maintained, and that is that Ben Reeves, the husband of Castella Brown, her surviving, is entitled to one-half of her allotment under: "Sec. 8. The lawful or acknowledged wife of a deceased husband shall be entitled to one-half of the estate, if there are no heirs, and an heir's part if there should be other heirs in all cases where there is no will. The husband surviving shall inherit of a deceased wife in like manner," which, he says, should be construed to read: "Sec. 8. The lawful or acknowledged wife of a deceased husband shall be entitled to one-half of the estate, if there are no children, and a child's part if there should be other heirs in all cases where there is no will. The husband surviving shall inherit of a deceased wife in like manner." He admits that Ben Reeves is an intermarried noncitizen of the Creek Nation,

and, in effect, that when section 8 was enacted such were not intended to take, but insists that, since that time, the Creek law has been changed, and permits such to inherit from the citizen wife.

In considering this construction, let us take another general view of the history of this tribe. After the issuance of the patent aforesaid, by the United States to the Creek Nation, the Creek people migrated from their homes in the East, and settled upon the lands therein described. For a long time they were comparatively free from intrusion, but in the course of time noncitizens sought to and did settle among them. After repeated futile efforts to exclude them by legislation, the National Council passed an act, which we find in the Compilation of the Creek Laws of 1890 (article 4, p. 66), which reads:

"Sec. 1. No noncitizen shall have a right to reside in or to own any kind of property within the Muskogee Nation, except by permit, and any noncitizen, without a permit, who shall make any improvements within the Muskogee Nation, shall forfeit the same to the nation."

This section shows in a marked degree the temper of the tribe as displayed towards noncitizens who had not intermarried with citizens thereof. In short, it is plain he had few rights that the tribal government felt called upon to respect. It seems that the rights of the intermarried noncitizens were somewhat more respected, for in that article we find:

"Sec. 2. This article shall not be construed so as to interfere with persons who are intermarried with citizens of the Muskogee Nation, or so as to interfere with any rights guaranteed by treaty."

Up to as late as October 28, 1893, the Supreme Court of the Creek Nation, in the case of *Edward Gibson v. J. P. Davison*, cited on page 19 of the record, "dismiss the case for want of jurisdiction of Edward Gibson," although at that time he was an intermarried noncitizen of the Creek Nation, and the husband of Julia Gibson, deceased. It was not until April 6, 1894, that the Creek courts ever asserted jurisdiction over the property, much

less the persons of intermarried noncitizens, and that was by virtue of the act of that date, set forth on page 18 of the record, and recited in the agreed statement of facts herein. In the light of these facts let us see what act of the Creek Council, if one there be, admitted an intermarried noncitizen to share in the deceased wife's allotment.

Under the circumstances, we think that he who asserts the right should prove it, at least by fair intendment. But it would seem that the act of April 6, 1894, shows a recognition of certain rights theretofore acquired by intermarried noncitizens. In part, it says: "The jurisdiction of our courts shall extend to controversies over property and property rights acquired by intermarried noncitizens of our nation, who, by virtue of this intermarriage with citizens, acquired such property rights and privileges, * * * *" and would seem to refer to the act of the Creek Council, set forth in the Compilation of 1890 (page 66), *supra*:

"Sec. 1. All noncitizens, not previously adopted, and being married to citizens of this nation, or having children entitled to citizenship, shall have the right to live in this nation and enjoy all privileges enjoyed by other citizens, except participation in the annuities and final participation in the lands."

Now, whatever might have been within the purview of the Creek Council at the time of the enactment of sections 6 and 8 of their statutes of descent and distribution, this section 1, perhaps, and of necessity the act of April 6, 1894, *supra*, was enacted in view of fast approaching allotment, and gives, without reserve, to the intermarried noncitizen, "all privileges enjoyed by other citizens, except participation in the annuities and final participation in the lands." This act was intended to and did extend to the intermarried noncitizen the right to inherit under tribal law, and put him on the same footing, under that law, with all other citizens, except, as so aptly expressed by the learned judge of the United States Court for the Western District of the Indian Territory in the case of *Edward Porter et al. v. Eck E. Brook,* "that he shall not be counted in making up the great frac-

tion which shall express what share of the soil shall belong to each citizen; that is, he shall not receive an allotment."

In holding this we are not unmindful of the two cases decided by the Supreme Court of the Creek Nation, set forth in full in the very able brief of Iowa Land & Trust Company, especially the *Rogers Case* (decided October 21, 1895), cited on page 10, and which passed upon the rights of John T. Rogers, an intermarried white man, under the Creek law, by virtue of descent cast by his wife in 1881. The court in that case held that he was "not an heir at law" of his wife, that such "must necessarily be a *bona fide* citizen entitled to all the rights, privileges, and immunities of our body politic," and that "no citizen by marriage can acquire such rights." But since that tme, as shown by section 1, *supra,* of the Compilation of 1890, as the Creek Council passed an act expressly providing that intermarried noncitizens "shall have the right to live in this nation and enjoy all the privileges enjoyed by other citizens, except," etc., we think it thus vested in the intermarried noncitizen the prerequisites mentioned in that decision to constitute an heir at law, and that Ben Reeves falls within the terms thereof. In this we are borne out by a later decision of the Supreme Court of the Creek Nation. This case is quoted in full on page 19 of the record. It was decided by that court in 1893, only a short time after section 1, *supra,* was put in compilation, and passed upon the rights of an intermarried noncitizen to inherit from his citizen wife, who had died in 1891. It appears in that case that section 1 was under construction by the Supreme Court of the Creek Nation, and was certainly so by the United States Circuit Court of Appeals, where the case was afterwards tried. The opinion of the Supreme Court of the Creek Nation in that case, "relative to Edward Gibson, finds that he is not a *bona fide* citizen of the M. N. [Muskogee Nation], and simply entitled to his own property, and an heir's part of the Julia Gibson estate; therefore, dismiss the case for want of jurisdiction of Edward Gibson." This controversy, to be sure, was over personal property, but the construction was made by that court in

the face of impending allotment, which came shortly following the creation of the Dawes Commission in 1893, and was, no doubt, made with full knowledge of its far-reaching effect. And furthermore, when in the "Original Agreement" the Creek people said that the allotments made thereunder should descend under the laws of descent and distribution of the Creek Nation, it necessarily follows that they meant that therein the intermarried noncitizen husband should receive out of his citizen wife's allotment an heir's part under section 1, *supra,* pursuant to the ruling of the Supreme Court of the tribe in the *Gibson Case.* It is well settled that:

"* * * Whenever Congress in legislating for the District of Columbia or the territories has borrowed from the statutes of a state provisions which had received in that state a known and settled construction before their enactment by Congress, that construction must be deemed to have been adopted by courts, together with the text which it expounded, and the provisions must be construed as they were understood at the time in the state." (26 Am. & Eng. Enc. of Law, p. 702.)

And as there is no reason why the laws of the Creek Nation and the decisions of its Supreme Court should be placed upon a different footing from those of any other state or territory of the Union (*Mackey et al. v. Cox,* 18 How. 100; 15 L. Ed. 299), we are of the opinion that when Congress, by the terms of the "Original Agreement," adopted the laws of descent and distribution of the Creek Nation, *supra,* it, at the same time, adopted the construction placed thereon prior thereto by the Supreme Court of that nation, and that we are bound by that construction.

But that decision simply holds that he is entitled to an "heir's part," and it yet remains for us to determine, if we can, what is meant by an "heir's part." Since section 8, *supra,* was not intended, then, at the time it was enacted, to cover intermarried noncitizens, but was made to do so by section 1, *supra,* and the decision of the Supreme Court of the Creek Nation, let us first get what light we can from the face of these sections construed with section 6, before attempting its final construction. In other

words, let us look to the face of all three, with a view of construing them all together. Construing the word "heir" or "heirs," as used in section 8, in its technical sense, and understood by the profession generally, the intent would appear on its face to be to postpone the inheritable right of the husband until after that of the remotest heir of the blood of the wife. It would thus seem that he was only intended to take one-half of the estate to avoid an escheat, if such there were under the Creek law. Or, if there should be discovered even the remotest heir or heirs of the blood of the wife, the husband should share it with him or them in equal parts. This intent might be plausible if the statute was enacted to apply alone to the inheritable right of an intermarried non-citizen husband, but when we know that it was intended to protect also the inheritable right of a citizen husband, and the inheritable right of a citizen wife, we cannot believe that such was the intention.

What, then, is meant by those words in that section, and what did the Supreme Court of the Creek Nation in the *Gibson Case* mean by an "heir's part?" It is clear that they were not so used in their technical sense, but in the common acceptation of those words. But, suppose they were used in their technical sense, who are heirs? Bouvier's Law Dictionary says an "heir" is "he who is born or begotten in lawful wedlock, and upon whom the law casts the estate in lands, tenements, or hereditaments immediately upon the death of his ancestors." What law? The law of the country where the land is situated. In this case the Creek law.

"An heir is whoever by the laws of the country hath right to inherit or succeed to the estate immediately upon the death of an owner, and is different as the law varies in different countries." (*Larabee v. Larabee*, 1 Root (Conn.) 555.)

What right have we to believe that there are heirs under the Creek law other than is named in sections 6 and 8 under construction, and which is agreed to be the law of descent and distribution of the Creek Nation in force at the time of descent cast in this

case? None whatever. Then who are denominated "heirs" under that law? The children, the "nearest relation" (in this case the mother), and the husband or wife of the deceased. Then, in this case, as there are no children, the "nearest relation" and this husband, it seems, would share equally this estate, since he is to have "one-half of the estate if there are no other heirs, and an heir's part if there should be other heirs." This is using the word "heir" as interchangeable with the word "heirs." In *Stokes v. Van Wyck*, 83 Va. 724, 3 S. E. 387, the court said:

"The word 'heir' is '*nomen collectivum*,' embraces all legally entitled to partake of the inheritance, and is interchangeable with the plural terms 'heirs.'"

But, let that be as it may, we are clearly of the opinion that those words were not used in any technical but in their common sense, and that the word "heir" or "heirs" were used in the sense of "child" or "children." "Child" and "heir" in common speech are often used as synonymous. *Smith v. Sheehan,* 67 N. H. 344, 39 Atl. 332. The technical distinction between the terms is not to be resorted to in construction except in nicely balanced cases. *Appeal of Lockwood,* 55 Conn. 157, 10 Atl. 517. In *Butler v. Huestis et al.,* 68 Ill. 602. 18 Am. Rep. 589, the court say:

"More latitude has been given to the construction of wills than deeds, and there is the highest authority for saying, to effectuate the clear intention of the testator, we may construe the words 'heir,' 'issue,' 'children,' interchangeably." (Citing *Braden v. Cannon,* 1 Grant Cas. [Pa.] 60; *Bowers v. Porter,* 4 Pick. [Mass.] 198; *Eby v. Eby,* 5 Pa. 461.

5 Am. & Eng. Enc. of Law (page 1093) says:

"But where it is necessary to give effect to the instrument, or where there are other words showing that 'children' was used in the sense of 'heirs,' the term will be construed as a word of limitation equivalent to 'heirs' or 'heirs of the body.' [citing authorities]. So the term 'heirs' has been construed as equivalent to 'children.'" (Citing authorities.)

As stated, section 8, *supra,* is found in Perriman's Compila-

tion of the Creek Laws of 1890, in chapter 10, under the head of "Administration of Property." In that same chapter we find:

"Sec. 3. The administrator shall, at all times, be required to make and provide liberal means for the support and education of all heirs of the deceased, to make any trade that may be of advantage to such estate, and to advise and direct the affairs of such heirs until they shall have become of age, according to the laws of this nation, or until such heirs shall marry, in which event the administrator shall turn over to such heirs of his or her inheritance everything connected with the estate that may have been placed in his care, or its equivalent in money or other property."

As these sections are in *pari materia,* let us ascertain in what sense the word "heirs" was used in the latter, as it is evident that they were used in the same sense in the former section. The rule is:

"In arriving at the intent of the Legislature in enacting a statute; not only must the whole statute and every part of it be considered, but where there are several statutes in *pari materia,* they are all, whether referred to or not, to be taken together, and one part compared with another in the construction of any material provision. Statutes are in *pari materia* which relate to the same person or thing, or to the same class of persons or things. * * * " (26 Am. & Eng. Enc. of Law, p. 620.)

Section 3 requires the administrator to "make and provide liberal means for the support and education of all heirs of the deceased." This solicitude would scarcely be displayed except for the children of the deceased or the children of a deceased child.

We are therefore of the opinion that by the first use of the word "heirs" in section 8, the word "children" was intended, and that by the use of the word "other" before "children" was intended to include grandchildren or the descendants of any child living at the death of the intestate, so that it should read in connection with:

"Sec. 6. Be it further enacted that if any person die without a will, having property and children, the property shall descend to the child or childern and their descendants, if any, equally, and if no child or descendants, and the estate descended to the

intestate on the part of the father, then to the father, and if no father living, then to the brothers and sisters of the blood of the father, etc. If the estate descended to the intestate on the part of the mother, then to the mother, and if no mother living, then to the brothers and sisters of the blood of the mother: Provided:

"Sec. 8. The lawful or acknowledged wife of a deceased husband shall be entitled to, one-half of the estate, if there are no children or their descendants, and a child's part, if any such there be, in all cases where there is no will. The husband surviving shall inherit of the wife in like manner."

Hence, we are of the opinion that Cynthia Tolliver is entitled to an undivided one-half interest in the allotment in controversy, and Ben Reeves, husband of Castella Brown, her surviving, the remaining one-half, unless the last remaining contention of the Iowa Land & Trust Company can be maintained, and, that is, that Ben Reeves, by murdering his wife, Castella Brown, was precluded from "qualifying" as her heir, and that the appellant De Graffenreid by conveyance from him took nothing.

It is not contended that Ben Reeves murdered his wife for the purpose of obtaining possession at once of her property, or his share of it, by inheritance. The record simply discloses that he murdered her, was duly convicted, and is now serving a sentence of life imprisonment therefor. In fact the record would seem to negative any such presumption, as the deed from him to De Graffenreid was made some two years thereafter, and after he had entered upon the service of his sentence. But if it were true that he murdered her for the purpose of at once getting possession of her property by inheritance, we do not think that would disqualify him from inheriting. 14 Cyc. p. 61, says:

"By the weight of authority, in the absence of express provisions excluding from inheritance an heir murdering the intestate, the operation of the statute of descent is not affected by the fact that the ancestor was murdered by the heir apparent in order to obtain the inheritance at once, and therefore an heir who murders his ancestor in order that he may inherit the estate at once is not disqualified from taking." (And authorities cited.)

That being the rule, when the killing is done for the pur-

pose of inheriting, it follows, *a fortiori*, that the same should be the rule when no such intention appears, and therefore we hold that Ben Reeves, because of the fact that he murdered his wife, Castella Brown, is not disqualified from inheriting from her under the Creek law of descent and distribution, and therefore the plaintiff in error De Graffenreid took, by his conveyance set forth in this cause, his entire interest in the allotment of said Castella Brown.

It follows that the judgment of the lower court should be reversed and remanded, with instructions to enter judgment in conformity with this opinion.

All the Justices concur.