## DAVISON v. GIBSON.

(Circuit Court of Appeals, Eighth Circuit. May 15, 1893.)

No. 204.

1. CONFLICT OF LAWS—CREEK NATION — COMMON LAW— HUSBAND AND WIFE.

In a controversy which involves the right of a husband to the personalty of his deceased wife, both of them being citizens of the Creek nation, where there is no showing as to what was the law or custom of that nation applicable to the matter, it is error to presume that the common law was in force therein, and to decide the controversy according to its rules.

2. SAME—LEX FORI.

Where such controversy is an action in the United States court for the Indian Territory, the rule of decision, in the absence of evidence as to what the Creek law is, is the law of the forum, which is to be found in Mansfield's Digest of the laws of Arkansas, put in force in the Indian Territory by Act Cong. May 2, 1890.

3. SAME—RIGHT TO GROWING CROPS.

Where the common law as to the right of the husband to the wife's property has never been adopted, or has been abrogated, the crops produced on the wife's land are the wife's property, although the husband contributed his labor to their production.

4. EVIDENCE—JUDICIAL NOTICE.

The court, in making up its opinion of the law of the case, is not limited in its researches to legal literature. It may consult works on collateral sciences or arts or history touching the topic on trial, and may appeal to the public archives.

In Error to the United States Court in the Indian Territory.

This was an action of replevin by J. P. Davison against Edward Gibson, in which there was judgment for defendant, and plaintiff brings error. Reversed.

Statement by CALDWELL, Circuit Judge:

Julia Gibson was born a slave in the Creek nation in the Indian Territory. Her master sold her to a slave owner in Missouri, who took her to that state, where she was held as a slave until 1854, when her mother purchased her freedom, and brought her back to the Creek nation. During the time she was a slave in Missouri she and Edward Gibson, who was also a slave, sustained towards each other the relation of husband and wife, so far as persons in a state of slavery could sustain that relation. Having been freed as a result of the civil war, Gibson, the defendant in error, went to the Creek nation in 1865, and he and Julia resumed the relation of husband and wife, which relation continued until Julia's death, on the 29th of April, 1891. By virtue of her residence in the Creek nation at the date of the treaty of June 14, 1866, (14 Stat. 785,) Julia acquired under article 2 of that treaty all the rights and privileges of a native citizen of the nation. Before Gibson went to the Creek nation, Julia owned and occupied 40 acres of land in that country, given to her by her mother and brother. She also owned some personal property. She left four children surviving her, two of them not the children of the defendant, Gibson. After her death, Gibson, her husband, claimed the personal property on the farm, and took possession of the same. J. P. Davison, one of Julia's children, was appointed administrator of her estate, and brought this action of replevin against Gibson in the United States court for the Indian Territory for the personal property, alleging that it belonged to the wife at the time of her death, and that, as her administrator, he was entitled to the possession of the same. There was a trial in the court below, and at the close of the evidence the court instructed the jury to return a verdict for the defendant, to which instruction the plaintiff duly excepted. There was a verdict in accordance with the instruction of the court, and judgment thereon, and the plaintiff sued out this writ of error.

S. B. Dawes (D. M. Wisdom and S. S. Fears, on the brief,) for plaintiff in error.

S. O. Hinds, (W. C. Jackson, on the brief,) for defendant in error.

Before CALDWELL and SANBORN, Circuit Judges, and THAYER, District Judge.

CALDWELL, Circuit Judge, (after stating the facts.) Assuming that the relation of husband and wife existed between the intestate and the defendant, by what law are his rights as husband to be determined? The intestate was a citizen and resident of the Creek nation, and the property was there. In the brief of the learned counsel for the defendant it is said:

"The Creeks have no married women's act allowing a wife to own and hold separate property, and in actions in the federal courts in the Indian Territory the rule of decision, in the absence of a statute or proof of the laws, rules, and customs prevailing in the Indian Territory, is the common law."

It is quite obvious this was the view adopted by the court below, and that it applied in the determination of the case the rules of the common law regulating the right of the husband to the wife's personal property.

The Creek nation has been long recognized by the United States as a "domestic dependent nation," (Cherokee Nation v. Georgia, 5 Pet. 1;) as a state in a certain sense, although not a foreign state or a state of the Union, (Holden v. Joy, 17 Wall. 211;) as a distinct community, with boundaries accurately described, (Worcester v. Georgia, 6 Pet. 515;) and as a domestic territory, (Mackey v. Coxe, 18 How. 100.) The right of local self-government has been accorded to the Creek nation from the earliest times. The laws and customs of the nation adopted for the government and protection of the members thereof by birth or adoption have never been interfered with by the United States. Rights acquired under these laws and customs have been respected and enforced. In Mackey v. Coxe, supra, the supreme court said there was "no reason why the laws and proceedings of the Cherokee territory, so far as relates to rights claimed under them, should not be placed upon the same footing as other territories in the Union." The Creek nation stands on the same footing.

It is very well settled that it will not be presumed that the English common law is in force in any state not settled by English colonists, (Whitford v. Railroad Co., 23 N. Y. 465; Savage v. O'Neil, 44 N. Y. 298; Flato v. Mulhall, 72 Mo. 522; Marsters v. Lash, 61 Cal. 622,) and it has been expressly decided that it will not be presumed to be in force in the Creek nation, (Du Val v. Marshall, 30 Ark. 230,) or in the Indian Territory, (Pyeatt v. Powell, 2 C. C. A. 367, 51 Fed. Rep. 551.) In Savage v. O'Neil, supra, the court said:

"There is no proof what the laws of Russia in reference to the property rights of married women were, and there is no presumption that the common law was in force there. Such a presumption is indulged by our courts only in reference to England and the states which have taken the common law from England. The courts cannot take notice of the laws of Russia unless they are proved, and in the absence of proof our own laws must of necessity furnish the rule for the guidance of our courts."

If, therefore, the court had no means of ascertaining what the law or custom of the Creek nation was on this question it should have applied the law of the forum. That law is found in chapter 104, Mansf. Dig., put in force in the Indian Territory by act of congress approved May 2, 1890, (26 Stat. 94, c. 182, § 31.) By that law all the property acquired by a wife, either before or after marriage, is her separate estate and property, and descends and is distributed to her children in equal parts. Chapter 104, § 2522, Mansf. Dig. It is true this statute was put in force in the Indian Territory after the marriage of the intestate with the defendant, and that the marital rights of the husband should be determined by the law then in force in the Creek nation; but it would undoubtedly be more rational to presume that the law or custom of the nation on this subject was in harmony with the statute adopted by congress, and that the act of congress was merely declaratory of the previously existing law, than to presume that the English common law, a system utterly at variance with the known habits and customs of Indians, was in force there. As there is no presumption that the domestic relations of the members of the Creek nation residing there are regulated or determined by the common law, we think that the statute adopted by congress on that subject, and which is now the law of the forum, must govern, unless it is shown that there was some prior law or custom of the Creek nation applicable to the case.

This ruling does not conflict with the doctrine of Pyeatt v. Powell, supra. That was a suit arising upon a contract entered into between citizens of the United States in the state of Kansas. Neither of the parties to the suit was a member of any of the Indian nations in the Indian Territory. The contract having been entered into outside of the Indian Territory between citizens of the United States not subject to the laws of any of the Indian nations occupying that territory nor amenable to the jurisdiction of their courts, this court held that the law of the forum must govern the rights of the parties, and that, in the absence of statutes repealing or modifying it, the common law was the law of the forum. Applying the rules of the common law in the decision of a controversy between citizens of the United States who were not subject to the Indian laws upon a contract entered into in one of the states, is a very different thing from applying it in a suit between parties who are citizens and residents of the Creek nation, and subject to its laws, upon a cause of action which arose in that nation, and involves the question of the marital rights of the husband under the custom or law of that nation. It is common knowledge, of which the court should take judicial notice, that the domestic relations of the Indians of this country have never been regulated by the common law of England, and that that law is not adapted to the habits, customs, and manners of the Indians. It would be an extremely anomalous proceeding for the court, by indulging in an obviously false presumption, to put in force in the Creek nation the English common law relating to the husband's right to his wife's property after that law in the particular mentioned has been

abrogated in the country of its origin, and in nearly every state and territory of the Union.

The court, in making up its opinion of the law of the case, is not limited in its researches to legal literature. It may consult works on collateral sciences or arts or history touching the topic on trial, and may appeal to the public archives for this purpose. Whart. Ev. §§ 282, 336; Brown v. Piper, 91 U. S. 42; U. S. v. Teschmaker, 22 How. 392; Kirby v. Lewis, 39 Fed. Rep. 66; Eureka Vinegar Co. v. Gazette Printing Co., 35 Fed. Rep. 570. The published laws of the Creek Nation contain this provision:

"The lawful or acknowledged wife of a deceased husband shall be entitled to one-half of the estate if there are no other heirs, and an heir's part if there should be other heirs, in all cases where there is no will. The husband surviving shall inherit of a deceased wife in like manner." Laws Muskogee Nation, c. 10, § 8.

In Col. Hawkins' history of the Creeks and their customs and laws, published in the collections of the Georgia Historical Society, (volume 3, pt. 1, p. 74,) it is said:

"Marriage gives no right to the husband over the property of his wife, and when they part she keeps the children and the property belonging to them."

Col. Hawkins was at one time a senator in congress from South Carolina. In 1801 he was appointed by Mr. Jefferson "principal agent for Indian affairs south of the Ohio," and was agent of the Creek Indians from 1801 to 1816, and continued to reside in the Creek country until 1825. His official position and long residence among the Creeks must have made him perfectly familiar with their customs and laws, and it is highly improbable that he would misrepresent them. Mr. Schoolcraft makes substantially the same statement as Col. Hawkins in reference to the customs and laws on this subject of the Creek and some other nations in the Indian Territory. Schoolcraft's History of the Indian Tribes, pt. 1, p. 283.

That such is the law of the Cherokee Nation appears from a printed volume of the laws of that nation, published by authority. By an act of the national council of the Cherokee Nation, approved November 9, 1825, (Laws Cherokee Nation, p. 53,) it is provided that where a husband dies having a wife and children his property shall be equally divided among the children, "allowing the widow an equal share with the children," and that when a wife dies "leaving a husband and children her property shall revert to her husband and children in the same manner." The following preamble appears to an act passed in 1829: "Whereas, it has long been an established custom in this nation, and admitted by the courts as law, yet never committed to writing, that the property of Cherokee women after their marriage cannot be disposed of by their husbands or levied upon by an officer to satisfy a debt of the husband's contracting contrary to her will and consent, and disposable only at her option, therefore," etc. Id. p. 142. And by an act approved October 25, 1843, it is declared "that it shall not be lawful to expose at public sale by virtue of an execution obtained from any of the courts of this nation any property belonging to a Cherokee

woman, a citizen of this nation, to satisfy the debts of her husband." Id. p. 80.

It is very well known that the general customs and laws of the several nations in the Indian Territory relating to the domestic relations are substantially the same. The device of a trustee to protect the separate property of a wife from the operation of the common law was, of course, unknown to the Indians. The wife's separate property under their customs and laws was such as she acquired, either before or after marriage, by gift, inheritance, purchase, or otherwise; and when their customs and laws speak of the wife's property it has relation to all property so acquired by the wife, and not to an equitable estate held by somebody in trust for her, and created by deed, devise, or marriage settlement. The Indians had no knowledge of these refinements.

We do not mean by anything we have said to foreclose the court below from ascertaining in any proper mode what the custom or law of the Creek nation is on this subject. What is decided is that the rights of the parties to this suit must be determined by the custom or law of the Creek nation applicable to the case, and, if it shall not be made to appear in some proper manner what that custom or law is, then chapter 104 of Mansfield's Digest, before referred to, will furnish the rule of decision.

There was evidence tending to show that the wife owned the property in controversy, or at least some portion of it. The farm was hers, and she owned some of the personal property before her husband came to the Creek nation; and the additions to the property after he joined her were derived principally from the products of the farm, which was cultivated and carried on by the joint labor of the wife, her children, and the defendant. Where the common law as to the right of the husband to the wife's property has never been adopted, or has been abrogated, the crops produced on the wife's land, although the husband contributed his labor towards their production, are the property of the wife. The ownership of the farm carries with it at law and in equity the right to its products. Bish. Mar. Wom. §§ 296–300; Rush v. Vought, 55 Pa. St. 437–443; Gage v. Dauchy, 34 N. Y. 293–297.

The judgment of the court below is reversed, and the cause remanded for a new trial.