**CRICKETT et al. v. HARDIN.**

No. 7478—Opinion Filed June 27, 1916.

Rehearing Denied July 18, 1916.

(159 Pac. 275.)

**1. Marriage—Indians—Validity.**

The purpose and effect of the provision of section 38 of an act of Congress approved May 2, 1890 (Act May 2, 1890, c. 182, 26 Stat. 81), was to validate all prior marriages of the members of the Five Civilized Tribes, contracted in good faith according to either the express law or the customs of the tribe, which for want of formality as to solemnization, registration, etc., might otherwise have been deemed invalid, and to legitimize and render the issue of such marriages capable of taking property and other rights by inheritance.

**2 Same—Presumptions.**

In all cases involving the validity of a marriage, contracted either according to the common law, or conformably to Indian custom, the courts of this state, recognizing the good of the parties, their children, and society, as the question of paramount importance, will alike indulge that presumption, generally accepted as one of the strongest known to the law, favoring innocence, good faith and matrimonial intention, to sustain the marriage.

(Syllabus by Bleakmore, C.)

Error from District Court, Sequoyah County; John H. Pitchford, Judge.

Action by Charles Crickett and others against Oliver C. Hardin. There was judgment for defendant, plaintiffs appeal. Reversed and remanded.

J. H. Jarman, for plaintiffs in error.

Curtis & Pitchford, for defendant in error.

Opinion by BLEAKMORE, C. This suit was commenced in the district court of Se-

quoyah county, on October 30, 1913, by the plaintiffs in error, to cancel certain deeds as clouds upon, and to quiet the title to, the lands described therein. The parties appear, and are referred to here as in the court below. The lands in question were allotted to one Mary Gann, a full-blood member of the Cherokee Tribe of Indians, who died intestate and without issue in 1903. Both plaintiffs and defendant deraign title through the heirs of said allottee, the plaintiffs claiming under Charles Crickett and Lucy Porter, the alleged brother and sister of the half blood, and defendant through Cornelius Secondi, her maternal uncle, the only brother of her mother, Chigona. The principal, if not the sole question involved, for a determination by the trial court, and presented here for review, is the legitimacy of the allottee. The plaintiff Jim Porter is the surviving husband of Lucy Porter, who is alleged to have been a half-sister of the allottee. However, it was admitted upon the trial that Lucy Porter was a child of Joseph Crickett and a woman called Salzey, to whom he was not married, and with whom he had never lived as his wife; and all rights claimed through Lucy Porter have been abandoned. The father of the allottee was one Josiah Crickett and her mother, Chigona. Subsequently to his alleged relations with Salzey, Josiah, for two years, beginning in 1881, lived and cohabited with Chigona, during which period the allottee, Mary Gann, was born to them.

In regard to the relationship between Josiah and Chigona, evidence was introduced on behalf of plaintiffs, in substance, as follows:

Ellis Chuculate, 64 years old, testified that he knew Josiah Crickett and Chigona, who lived together as man and wife for about two years in a house on his land, within a quarter of a mile from his home, where their child Mary Gann, was born; that he visited them and considered them man and wife, and they were so recognized in that community; that they separated some four months after the birth of the child, Chigona leaving, the cause of the separation, as stated by Josiah, being that Chigona was a poor housekeeper; that after such separation and the death of Chigona, Josiah lived with Susan Big Feather, by whom he had a child, the plaintiff, Charles Crickett.

Eliza Chuculate, wife of Ellis Chuculate, who resided some three miles distant at the time, testified that she knew Josiah and Chigona when they were living together, and visited at their house, and saw the child, Mary, there when she was several months old. She was asked and answered the following question:

"Q. Don't you know it was generally talked in the community there and understood that

they had just taken up together; that there had never been any marriage ceremony, according to the Cherokee law? A. That they were living together as man and wife was my knowledge of the case. Q. You don't know when they went together, or how they got together? A. When I knew them in that relation, they were together, living together."

Dan Chuculate testified that Josiah and Chigona lived together for two years on the Ellis Chuculate farm, and had one child, Mary, and were recognized in that community as husband and wife; that after Chigona's death Josiah was married at his house to Susie Big Feather, the ceremony being performed by a Cherokee preacher.

George Coldridge, who lived some 15 miles away, testified that he knew Josiah and Chigona lived together as husband and wife on the Ellis Chuculate place; that he visited in that community and went to their house; that they were living there when the child, Mary, was born; that the baby was about six months old when Chigona left.

Steve Simmons testified that he knew Josiah and Chigona, and that on one occasion, upon the invitation of Josiah to go home with him, he spent the night with them on the Ellis Chuculate farm.

Susie Scrapper, formerly Susie Big Feather, testified that she was the widow of Josiah Crickett; that after Chigona's death she was married to him by a preacher; that of said marriage there were born to her two children, the plaintiff, Charles Crickett, and another who died in infancy; that her husband, Josiah, told her that Chigona had been his wife, and that Mary was their child.

Opposed to this evidence is the testimony of a number of witnesses as to circumstances by which it was attempted to be shown that Josiah and Chigona had not lived together as man and wife, and as to rumors to the effect that the allottee was the illegitimate child of Chigona and one Newt Fry. None of these witnesses, however, lived in the immediate vicinity, and none of them could state that Josiah and Chigona did not, in fact, live together as man and wife on the Ellis Chuculate farm.

John L. Strongston, 70 years old, who had been clerk of the District, Circuit, and Cherokee Courts, sheriff, interpreter, and Secretary of the Cherokee Nation, testified relative to the marriage customs of the Cherokees at the time Josiah and Chigona lived together, as follows:

"A. The Cherokees, the full-blood class of Cherokees, as a general thing, with very few exceptions, in their instituting the marriage relations, just simply, as I understand, got together and married, without judge, jury,

clerk, minister, or anybody else. That was the way they married. This applies only to the full-blood class, to the full-blood class particularly. I will admit it, for the sake of argument, that that system entered into, or was practiced to a certain extent among the mixed class, but not generally. * * * Q. In other words, among the full bloods they had a custom of just meeting up with each other, and if the relationship was congenial they went on to living together? A. Well, this meeting up with one another, I suppose they got together some way or other, but it wasn't through the regular matrimonial channel, as we understand it. Q. They disregarded the law of the land so far as the public acts of the Cherokee Council was concerned? A. Well, they didn't comply with the requirements of the law, and they didn't marry by judge or clerk or minister. They just took up together, as the saying was."

Certain written laws of the Cherokee Nation relating to marriages were introduced, by which it was provided that marriages may be solemnized by a judge, clerk of the district court, or an ordained minister of the gospel, and, further:

"Any marriage contracted in writing in the presence of two or more attending witnesses, who shall sign the certificate of marriage contract shall be lawful."

By such laws it was also required of the parties to a marriage contracted in the presence of witnesses, and of persons solemnizing other marriages, to report the same for registration to the clerk of the district, whose duty it was at once to make a record thereof.

There was also introduced in evidence a decision of the Supreme Court of the Cherokee Nation, rendered November 17, 1886, construing and declaring the effect of such law in the case of Teehee v. Teehee, wherein it was said:

"The evidence in the case shows that plaintiff Cather Teehee, deceased, lived together and cohabited for a period of several years, and it is argued that such living together and cohabiting constituted marriage between the parties according to the customs of the Cherokee people. Whatever may have been the custom among the Cherokees, the law of 1875, regulating marriage, like all other general laws, applies to all classes of Cherokee citizens, and suspends and annuls customs. Cohabitation for any period does not, under the laws of the Cherokee Nation, constitute marriage."

The trial court made the following, among other, findings:

"I find from the proof that Josiah Crickett and Chigona Secondi, known as Rachel, did assume a cohabital relation, which relation was indefinite as to length of time, ranging probably from 1 to 2 years; that during this relation between Josiah and Chigona, Mary was born, Mary afterwards married

Tom Gann. At the time of the death of Mary she left surviving her, her uncle, Cornelius Secondi."

"I find that Chigona had died before 1890, and before the laws of Congress were extended over the Cherokees; that is, prior to the act of 1898. It might be that if this relation existed after 1898, a common-law marriage would be recognized. But prior to 1898 the Cherokee Nation was a quasi independent nation or country, and was permitted to have its own government, and to enact and execute its own laws, and I take it that we are bound by the decisions of the Supreme Court of the Cherokee Nation construing their own laws, when that nation was exercising all rights of government."

To our minds it is clearly and conclusively established by the evidence that Josiah Crickett and Chigona, full-blood Cherokee Indians, assumed and maintained the marital relation according to the tribal custom universally prevailing among members of their class in that nation at the time; their status as man and wife was recognized by their neighbors and acquaintances, and during the period they so lived together their child, Mary, the allottee, was born.

By section 38 of an act of Congress approved May 2, 1890 (26 Stat. 81), it is provided:

"That all marriages heretofore contracted under the laws or tribal customs of any Indian Nation now located in the Indian Territory are hereby declared valid, and the issue of such marriage shall be deemed legitimate and entitled to all inheritances of property or other rights, the same as in the case of the issue of other forms of lawful marriage."

The obvious purpose and effect of this provision was to validate all prior marriages of members of the Five Civilized Tribes, contracted in good faith, according to either the express law or the customs of the tribe, which for want of formality as to solemnization, registration, etc., might otherwise have been deemed invalid, and to legitimize and render the issue of such marriages capable of taking property and other rights by inheritance.

In this and other jurisdictions where common-law marriages are recognized as valid, the doctrine announced in 1 Bishop on Marriage, Divorce, and Separation, sec. 956, prevails, viz:

"It being for the highest good of the parties, for the children, and of the community that all intercourse between sexes in form matrimonial should be such in fact, the law, when administered by enlightened judges, seizes upon all probabilities and presses into its service all things else which can help it, in each particular case, to sustain the marriage, and repel the conclusions of unlawful commerce."

While the common law had not been put in force or extended in its operation by congressional enactment so as to affect the domestic relations of members of the Five Civilized Tribes at the time Joseph Crickett and Chigona lived together, and "it is common knowledge of which the court should take judicial notice that the domestic relations of the Indians of this country have never been regulated by the common law of England, and that that law is not adapted to the habits, customs, and manners of Indians (Davison v. Gibson, 56 Fed. 443, 5 C. C. A. 543), it would, indeed, be passing strange should courts in this enlightened age, in considering the validity of marriage contracts made conformably to Indian tribal custom, although not in strict compliance with the written tribal law, refuse to indulge that presumption, generally accepted as one of the strongest known to the law, favoring the innocence, good faith, and matrimonial intention of the parties, and thus destroy Indian marriages and stigmatize their issue as illegitimate, while recognizing and applying such presumption to sustain common-law marriages of whites, founded on similar relations. Recognizing, regardless of race, that the good of the parties, their children, and society, is the question of paramount importance in all such cases, this court has applied alike the salutary doctrine announced in Bishop on Marriage, Divorce, and Separation, supra, to all forms of marriage in fact contracted.

In the well-considered case of Chancey v. Whinnery, 47 Okla. 272, 147 Pac. 1036, wherein the validity of an Indian custom marriage was involved, it was said by Mr. Justice Sharp, speaking for the court:

"The authorities, with very general accord, are to the effect that, when a marriage in fact has been shown, the law raises a presumption that it is valid, casting the burden on him who questions it to establish its invalidity. This is one of the strongest presumptions known to law. * * * Measured by the rule laid down, plaintiff failed in his proof. Every intendment of law is in favor of matrimony. The law is so positive in requiring a party who asserts the illegality of a marriage to take the burden of proving it that such requirement is enforced even though it involve the proving a negative. When a marriage has been shown in evidence, whether regular or irregular, and whatever the form of the proofs, the law raises a presumption of its legality, not only casting the burden of proof on the party objecting, but requiring him throughout and in every particular plainly to make the fact appear, against the constant pressure of this presumption, that it is illegal and void."

The judgment should be reversed, and the

cause remanded, with directions to the trial court to render judgment in conformity to the views herein expressed.

By the Court: It is so ordered.